# EXHIBIT

# 1

**EXHIBIT 1**

1  JINA L. CHOI (N.Y. Bar No. 2699718)
   SUSAN F. LaMARCA (Cal. Bar No. 215231)
2    lamarcas@sec.gov
   AARON P. ARNZEN (Cal. Bar No. 218272)
3    arnzena@sec.gov
   VICTOR HONG (Cal. Bar No. 165938)
4    hongv@sec.gov

5  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
6  44 Montgomery Street, Suite 2800
   San Francisco, California 94104
7  Telephone:  (415) 705-2500
   Facsimile:  (415) 705-2501
8
   DANIEL M. HAWKE (Admitted to D.C. Bar)
9  701 Market Street
   Philadelphia, Pennsylvania  19106
10
   JOSEPH G. SANSONE (Admitted to N.Y. Bar)
11 3 World Financial Center, Suite 400
   New York, New York 10281
12

13

14                   UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17

18 SECURITIES AND EXCHANGE COMMISSION,   Case No. C-

19          Plaintiff,

20     v.                                **COMPLAINT**

21 SALEEM KHAN, AMMAR AKBARI,
   ROSHANLAL CHAGANLAL and RANJAN
22 MENDONSA

23          Defendants,

24      and

25 SHAHID KHAN and MICHAEL KOZA,

26          Relief Defendants.

27

28

1      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

2  defendants Saleem Khan, Ammar Akbari, Roshanlal Chaganlal, and Ranjan Mendonsa (collectively,

3  "Defendants"), and against relief defendants Shahid Khan and Michael Koza (collectively, "Relief

4  Defendants"), alleges:

5  **SUMMARY**

6      1.    This case involves serial insider trading in the securities of Ross Stores, Inc. ("Ross")

7  and Taleo Corporation ("Taleo") by Saleem Khan and his friends and colleagues.  From at least 2009

8  through December 2012, Roshanlal Chaganlal provided Saleem Khan with material nonpublic

9  information about Ross' monthly sales figures, which Chaganlal obtained by virtue of his position at

10  Ross.  Chaganlal was a director, and later a senior director, in Ross' finance department, where he

11  had access to confidential sales and internal forecast numbers.  Saleem Khan purchased Ross stock

12  options and stock based on the information he learned from Chaganlal not only in his own accounts

13  but in those of relief defendants Michael Koza and Saleem Khan's brother-in-law, Shahid Khan.

14  Saleem Khan traded ahead of over 40 Ross monthly and quarterly announcements between 2009 and

15  2012.  On some days, his trading constituted over 90 percent of the options volume for the options

16  series in which he traded.  Saleem Khan generated realized and unrealized profits of approximately

17  $5.4 million in his own account and approximately $6 million in Shahid Khan's account, which he

18  also controlled.  As part of the scheme, Chaganlal provided $17,000 to Saleem Khan, who used the

19  funds for additional insider trading.  To compensate Chaganlal for Ross' inside information, Khan

20  later transferred at least $130,000 back to Chaganlal.

21      2.    Saleem Khan also provided Ross' inside information to his friend and supervisor,

22  Ranjan Mendonsa, and to his friend and colleague, Ammar Akbari, both of whom also purchased

23  Ross stock options based on the information, generating realized and unrealized profits of

24  approximately $800,000 and $2,000, respectively.

25      3.    Saleem Khan also engaged in insider trading of Taleo stock options ahead of a

26  February 9, 2012 announcement by Oracle Corporation of its intention to acquire Taleo.  After

27  learning of the impending acquisition from a friend at Oracle, Saleem Khan began purchasing stock

28

1   options in Taleo six days before the announcement.  Following the announcement of the acquisition,

2   Saleem Khan reaped illegal, realized and unrealized profits of approximately $450,000.

3   **JURISDICTION AND VENUE**

4         4.       The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the

5   Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1].

6         5.       This Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of

7   the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].

8         6.       Defendants and Relief Defendants, directly or indirectly, made use of the means or

9   instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities

10   exchange in connection with the transactions, acts, practices and courses of business alleged herein.

11         7.       Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C.

12   § 78aa] because a substantial part of the acts and transactions constituting the violations alleged in

13   this Complaint occurred within the Northern District of California, and because one or more

14   Defendants and Relief Defendants resides or transacts business in the district.

15   **INTRADISTRICT ASSIGNMENT**

16         8.       Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

17   Francisco and Oakland Division, because a substantial part of the events or omissions which give rise

18   to the claim alleged herein occurred in Alameda and Contra Costa Counties.

19   **DEFENDANTS AND RELIEF DEFENDANTS**

20   **Defendants**

21         9.       Saleem Khan, age 50, resides in Dublin, California and is the brother-in-law of relief

22   defendant Shahid Khan.  Saleem Khan was a registered securities broker and was employed by a

23   major retail brokerage firm from approximately 1992 through 1994.  He subsequently worked as a

24   senior financial analyst for a retail company in the 1990s, where he met defendant Roshanlal

25   Chaganlal ("Chaganlal").  Saleem Khan later worked in the finance departments of a major, publicly-

26   traded grocery chain and its subsidiary from approximately 2002 through 2007.  From in or about

27   December 2007 until April 2008, he worked as a contractor in Ross' finance department, reporting to

28   Chaganlal.  For several months in 2008, Saleem Khan was a senior finance consultant at a large,

1   publicly-traded technology firm.  After that, he was a finance manager at a national, non-profit health

2   care company from approximately December 2008 until June 2012, where he reported to defendant

3   Ranjan Mendonsa ("Mendonsa").  Saleem Khan has been self-employed since January 2012.  During

4   the Commission's investigation that preceded this action, Saleem Khan invoked his Fifth Amendment

5   privilege, refusing to answer questions substantively during sworn testimony.

6          10.     On December 6, 2012, the United States Attorney's Office for the Northern District of

7   California indicted Saleem Khan for bank fraud and for making false statements to a financial

8   institution in violation of 18 U.S.C. §§ 1014 and 1344, in *United States v. Saleem Khan*, CR 12 860

9   (YGR) (N.D. Cal.).  Among other things, the indictment charged that Saleem Khan's hardship letter

10  seeking agreement from a bank on a proposed "short sale" of residential real estate failed to disclose

11  his profits from the securities trading alleged herein.  On July 25, 2013, Saleem Khan pled guilty to

12  both charges, and was sentenced to 21 months in prison and ordered to pay a $60,000 fine.

13         11.     Roshanlal Chaganlal, age 51, is a resident of Dublin, California.  He was employed as

14  the assistant controller of a retail company from approximately December 1997 through April 1998,

15  where he first met defendant Saleem Khan.  From approximately November 2000 through October

16  2005, Chaganlal worked as a vice president and director of corporate marketing and finance at the

17  same major, publicly-traded grocery chain as Saleem Khan.  From around February 2007 through

18  December 2012, Chaganlal worked as the director and then senior director of shortage control in

19  Ross' finance department.  Ross terminated his employment in December 2012.  During the

20  Commission's investigation that preceded this action, Chaganlal invoked his Fifth Amendment

21  privilege, refusing to answer questions substantively during sworn testimony.

22         12.     Ranjan Mendonsa, age 46, is a resident of San Ramon, California.  From

23  approximately 2004 through 2008, Mendonsa was a director of finance, marketing, planning and

24  operations at the same major, publicly-traded grocery chain where Saleem Khan and Chaganlal

25  worked.  From approximately July 2008 through January 2013, Mendonsa served as the executive

26  director of finance for the information technology group of the same national, non-profit health care

27  company where Saleem Khan and defendant Ammar Akbari ("Akbari") worked.  Mendonsa hired

28  Saleem Khan to join that company in or around early 2009 and Saleem Khan reported to him during a

1  portion of the relevant period.  During the Commission's investigation that preceded this action,
2  Mendonsa invoked his Fifth Amendment privilege, refusing to answer questions substantively during
3  sworn testimony.

4        13.   Ammar Akbari, age 36, is a resident of Dublin, California.  From approximately
5  November 2009 through at least November 2013, he was a financial analyst in the finance group of
6  the national, non-profit health care company where Saleem Khan and Mendonsa worked, having been
7  hired into that position by Saleem Khan, to whom he reported.  During a portion of the relevant
8  period, Saleem Khan, Mendonsa and Akbari worked on the same floor of the non-profit health care
9  company.  During the Commission's investigation that preceded this action, Akbari invoked his Fifth
10  Amendment privilege, refusing to answer questions substantively during sworn testimony.

11        **Relief Defendants**

12        14.   Shahid Khan, age 43, resides in San Ramon, California and is the brother-in-law of
13  Saleem Khan.  Shahid Khan allowed Saleem Khan to trade in his brokerage account and received
14  some of the ill-gotten proceeds from Saleem Khan's trading in Ross securities.  Shahid Khan is
15  named as a relief defendant in this action for the purpose of assuring complete relief.

16        15.   Michael Koza, age 55, is a resident of Sacramento, California.  Koza and Saleem
17  Khan met through their investments in the residential real estate market.  Koza allowed Saleem Khan
18  to trade in his brokerage account and received some of the ill-gotten proceeds from Saleem Khan's
19  trading in Ross and Taleo securities.  Koza is named as a relief defendant in this action for the
20  purpose of assuring complete relief.

21        **Other Relevant Individuals and Entities**

22        16.   Ross Stores, Inc. is Delaware corporation headquartered in Pleasanton, California.  Its
23  common shares are registered pursuant to Section 12(b) of the Exchange Act and traded on the
24  Nasdaq Stock Market (Ticker: ROST).  Ross is a discount retailer of apparel.

25        17.   Taleo Corporation was a Delaware corporation headquartered in Dublin, California
26  until approximately April 2012, when it was acquired by Oracle Corporation.  Before the acquisition,
27  Taleo's common shares were registered pursuant to Section 12(b) of the Exchange Act and traded on

28

the Nasdaq Stock Market (Ticker: TLEO).  Taleo was in the business of selling software used by

other companies for recruiting, performance management, compensation and related areas.

18.     Oracle Corporation is a Delaware corporation headquartered in Redwood City,

California.  It has issued common stock that is registered pursuant to Section 12(b) of the Exchange

Act and, until in or around July 2013, its securities were traded on the NASDAQ Stock Market

(Ticker: ORCL), after which time those securities became listed on the New York Stock Exchange.

Oracle is in the business of selling enterprise software to other businesses, including database,

networking and cloud based services.

## FACTUAL ALLEGATIONS

### A.  The Ross Insider Trading Scheme

19.     Beginning in or around June 2009 and continuing until approximately December

2012, defendants Saleem Khan, Chaganlal and Mendonsa engaged in a scheme to trade the securities

of Ross in advance of Ross' monthly and quarterly announcements of its sales results.  The

Defendants' trades were based on material nonpublic information.  Beginning in or around May

2011, defendant Akbari joined the scheme.

20.     From approximately February 2007 through December 2012, Chaganlal was the

director, and then senior director, of shortage control at Ross, where his responsibilities included

measuring and reducing Ross' inventory losses due to theft and other causes, which Ross referred to

as "shrinkage."

21.     As part of his duties, Chaganlal gained access to Ross' confidential sales figures,

which he was required to consult in order to generate reports that quantified shrinkage as a

percentage of Ross' total sales, among other things.  More specifically, company sales figures that

were updated daily -- called "flash sales" or "daily flash sales" -- were posted on a Ross internal web-

page with access privileges limited to a relatively small group of Ross employees.  Beginning no later

than March 2009, Ross provided Chaganlal with access to its daily flash sales website.  For each

month thereafter until the termination of his employment, Chaganlal frequently accessed Ross' daily

flash sales before the company made its monthly sales information public.  Indeed, Chaganlal saved

the link to this website as a "favorite" in his work internet browser and Ross' sales results were also

discussed at weekly Thursday staff meetings held by Ross' Controller with his direct reports, including Chaganlal.

22.     On the first Thursday of every month, Ross publicly announced its sales figures for the prior month.  Before these announcements, information surrounding Ross' monthly sales results was material nonpublic information.

23.     On or about July 6, 2009, just a few months after receiving access to Ross' confidential daily flash sales figures, Chaganlal provided Saleem Khan with $17,000 so that Saleem Khan could trade securities, including Ross securities, on Chaganlal's behalf.

24.     Rather than giving Saleem Khan the funds directly, and in order to avoid detection, these defendants employed a circuitous route for funneling the money to a trading account.  First, on or about July 6, 2009, two cashier's checks for approximately $8,500 each, which had been purchased under the name of Chaganlal's wife (who had a different surname from Chaganlal), were deposited into the bank account of Saleem Khan's brother-in-law, Shahid Khan.  Then, on or around July 7, 2009, Shahid Khan transferred the money into a brokerage account at a Chicago-based brokerage firm held in his own name.

25.     Saleem Khan maintained two brokerage accounts at this Chicago-based brokerage firm in his own name, and also controlled the trading and activity in Shahid Khan's account at the same firm.  Indeed, Saleem Khan opened his brother-in-law's account in March 2008 at the same time he opened an account in his own name at the same brokerage firm.

26.     Based on Chaganlal's tips regarding Ross' upcoming monthly sales announcements, Saleem Khan traded Ross securities (on behalf of himself and Chaganlal) in these brokerage accounts, and generated tremendous profits in doing so.  This illegal insider trading in Ross securities continued, in serial fashion, from August 2009 through December 2012, when Ross terminated Chaganlal's employment.  Saleem Khan generated nearly $12 million in realized and unrealized profits ($5.4 million in his own accounts and $6 million in Shahid Khan's account) from illegally trading in Ross securities.

27.     Saleem Khan went on to tip this same confidential information he had learned from Chaganlal to his supervisor Mendonsa and his direct report Akbari, who generated at least

1   approximately $800,000 and $2,000, respectively, in realized and unrealized profits from illegally

2   trading in Ross securities.

3         28.    Appendix A, attached hereto, summarizes Defendants' illegal insider trading in Ross

4   securities on the basis of material nonpublic information, sourced from Chaganlal, concerning Ross'

5   sales figures.

6         29.    Several specific examples and events surrounding Defendants' insider trading in Ross

7   securities are alleged in detail below.

8       **B. Ross' August 6, 2009 Monthly Sales Announcement**

9         30.    As alleged above and at all relevant times, by virtue of Chaganlal's position at Ross,

10   his participation in meetings and his access to Ross' sales numbers, including daily flash reports,

11   Chaganlal knew Ross' monthly sales results before the company announced them to the public.

12   Indeed, Ross' internal daily flash reports showed the company's sales as of the prior day, so

13   Chaganlal could view Ross' monthly sales progress on a daily basis throughout any given month.

14         31.    On or around August 2, 2009, Ross' flash reports reflected the company's sales for the

15   entire month of July 2009.  Although Ross did not publicly announce its July 2009 sales figures until

16   August 6, 2009, Chaganlal learned of these results through his insider status by no later than August

17   2, 2009.

18         32.    During the days leading up to Ross' August 6, 2009 monthly sales announcement,

19   Chaganlal communicated regularly with Saleem Khan, providing him with material nonpublic

20   information regarding Ross' impending sales announcement.  As an example, Saleem Khan and

21   Chaganlal exchanged at least eleven phone calls from on or around August 1, 2009 through on or

22   around August 4, 2009.

23         33.    Also during this time, Saleem Khan communicated regularly with Mendonsa,

24   providing him with Chaganlal's insider information regarding the impending Ross sales

25   announcement.  On or around August 3, 2009, a few minutes after the conclusion of a two-minute

26   telephone conversation between Chaganlal and Saleem Khan, Saleem Khan telephoned Mendonsa.

27   Saleem Khan's telephone call to Mendonsa was followed by at least three additional phone calls

28   between Saleem Khan and Mendonsa.  All four of the above calls between Saleem Khan and

1  Mendonsa occurred after the NASDAQ market close.  On or around the morning of August 4, 2009,
2  Mendonsa began purchasing Ross call options.  A call option is a financial contract between two
3  parties that gives the buyer the right, but not the obligation, to buy an agreed quantity of stock during
4  a specified time period for a specified price, known as the strike price.  A buyer pays a fee, or
5  premium, to purchase this right.  A buyer of a call option generally stands to gain if the price of the
6  stock increases.

7     34.  When Mendonsa received nonpublic information concerning Ross' sales results, he
8  was aware that Saleem Khan had previously worked for Ross, that Saleem Khan was friends with
9  Chaganlal, and that Chaganlal then held a high-level finance position at Ross.  In fact, in or around
10  June 2009, Saleem Khan had introduced Mendonsa to Chaganlal in order to further Mendonsa's
11  interest in applying for a job at Ross.

12     35.  Saleem Khan (on behalf of himself and Chaganlal) and Mendonsa both used the
13  nonpublic information Chaganlal provided about Ross's monthly sales results to place securities
14  trades ahead of the company's announcements.

15     36.  In particular, on or about August 4, 2009 and August 5, 2009, Saleem Khan purchased
16  a total of approximately 1,078 call options on Ross securities.  Saleem Khan paid approximately
17  $102,000 to purchase the call options.  He purchased approximately 304 options in a trading account
18  that he maintained in his own name, and approximately 774 options in the account opened in the
19  name of his brother-in-law, relief defendant Shahid Khan.  As alleged above, Shahid Khan's account
20  was the account into which Saleem Khan had deposited approximately $17,000 provided by
21  Chaganlal in or around July 2009.  These positions represented a bet that the market price for Ross
22  shares would increase before the options expired.

23     37.  Similarly, from on or about August 4, 2009 through August 5, 2009, Mendonsa
24  purchased approximately 395 call options on Ross securities, spending approximately $61,000.  Like
25  the options purchased by Saleem Khan, Mendonsa purchased call options with the same short-term
26  expiration dates, though in smaller volume than Saleem Khan.  These positions, like those established
27  by Saleem Khan, represented a bet that the market price for Ross shares would increase before the
28

1    options expired. Mendonsa purchased these options while in possession of material nonpublic

2    information about Ross' financial results that he learned from Saleem Khan.

3       38.      On or about August 6, 2009, before the market opened, Ross announced its July

4    monthly sales results for the four weeks and 13 weeks ended August 1, 2009. In the announcement,

5    Ross disclosed that "same store" sales during July 2009 had increased by 4%. For the 13-week

6    period ended August 1, 2009, Ross announced that its sales totaled $1.769 billion, an 8% increase

7    over the sales reported for the 13 weeks ended August 2, 2008. As a result of this announcement,

8    Ross' share price rose by approximately 3% (or $1.41 per share) that day as compared to its prior day

9    closing price. The price continued to increase the following day, closing up an additional $1.52 per

10    share.

11       39.      On or about August 7, 2009, the day following Ross's public announcement, Saleem

12    Khan sold all of the options he had purchased just days earlier, taking advantage of the significant

13    increase in Ross's share price and obtaining a substantial profit of approximately $185,000.

14    Mendonsa generated realized and unrealized profits of over approximately $30,000 on his trades.

15      **C. Ross' May 5, 2011 Monthly Sales Announcement**

16       40.      As alleged above, Chaganlal continued to access to material nonpublic information

17    concerning Ross' April 2011 sales results, including the company's daily flash sales reports. In the

18    days leading up to Ross' monthly sales announcement to the public on or about May 5, 2011, by

19    virtue of Chaganlal's position at Ross, his participation in meetings and his access to Ross' sales

20    numbers, including daily flash reports, Chaganlal knew that the company would report sales numbers

21    that exceeded prior period results.

22       41.      As Chaganlal had previously done, during the pre-announcement period, when he

23    knew Ross' sales results but the public did not, Chaganlal communicated regularly with Saleem

24    Khan, providing Khan with the material nonpublic information that Chaganlal possessed regarding

25    Ross' sales figures. On or about April 26, 2011, for example, Saleem Khan and Chaganlal called

26    each other at least 15 times.

27       42.      Also during the days leading up to Ross' May 5, 2011 announcement, Saleem Khan

28    communicated regularly with Mendonsa, providing Mendonsa with the material nonpublic

1   information that Saleem Khan had obtained from Chaganlal regarding the impending Ross monthly

2   sales announcement.  For instance, on April 26, 2011, Saleem Khan and Mendonsa called each other

3   seven times, and on or about April 27, 2011, Mendonsa called Saleem Khan another three times.

4       43.    Both Saleem Khan (on behalf of himself and Chaganlal) and Mendonsa traded Ross

5   securities in late April 2011 and early May 2011, while in possession of the material nonpublic

6   information alleged above.

7       44.    From on or around April 27, 2011 through May 4, 2011, Saleem Khan purchased Ross

8   call options in his own accounts and in that of Shahid Khan, spending approximately $875,000 to

9   trade approximately 4,300 options with strike prices between $72 and $85 and expiration dates in

10  May and June 2011.  His trading in Ross options was so heavy that, on certain days, Saleem Khan's

11  trades accounted for nearly all of the daily volume for the options series in which he traded.

12      45.    Similarly, from on or around April 29, 2011 through May 3, 2011, Mendonsa spent

13  approximately $131,000 to purchase approximately 805 Ross call options with strike prices of $72.50

14  and $75.00 and expiration dates in May and June 2011.

15      46.    On May 5, 2011, Ross publicly announced its April 2011 sales results, including a

16  10% increase in same store sales over the same period in the prior year.  That day, Ross shares closed

17  at $78.55, up 7% from the prior day closing price of $73.45.

18      47.    Saleem Khan generated realized and unrealized profits of approximately $2.1 million

19  on the options he traded in the days leading up to this announcement.

20      48.    On or about May 5, 2011, Mendonsa sold the Ross options he had purchased in the

21  days leading up to announcement, realizing profits of approximately $285,000.

22  **D. Defendant Akbari Joins the Scheme, Trading ahead of Ross Sales Announcements.**

23      49.    Akbari also traded Ross options ahead of Ross' public announcements based on

24  material nonpublic information that he received from Saleem Khan and that Saleem Khan had earlier

25  received from Chaganlal.

26      50.    For example, on or around November 1, 2011, Ross' flash reports showed that its

27  month-to-date same store sales were up by approximately 5%.  Chaganlal was aware of this

28

1   information by virtue of his position at Ross, his participation in meetings and his access to Ross'

2   sales numbers, including the company's daily flash reports.

3        51.    Throughout late October 2011 and November 2011, Chaganlal communicated

4   regularly with Saleem Khan, providing him with the material nonpublic information he possessed

5   regarding Ross' impending sales announcement.

6        52.    Saleem Khan, in turn, shared this information with Akbari.  For instance, on or about

7   November 1, 2011, Akbari called Saleem Khan and the two defendants spoke for nearly two minutes.

8   Less than an hour later, Akbari bought approximately ten Ross call options with a strike price of

9   $87.50 and an expiration date in November 2011.  That morning, Saleem Khan also purchased Ross

10  call options with the same strike price and expiration as Akbari.

11       53.    When Akbari received nonpublic information concerning Ross' sales results, he was

12  aware that Saleem Khan was friends with Chaganlal, and that Chaganlal then had access to nonpublic

13  information concerning Ross' financial information.  Among other things: Saleem Khan, Chaganlal,

14  and Mendonsa knew each other and were jointly involved in considering real estate transactions as

15  early as in or around May 2010; Saleem Khan used Chaganlal's Ross email address when he sent an

16  email concerning a potential real estate transaction to Chaganlal and Akbari in or around May 2010;

17  and Akbari bought Chaganlal's own house in or around December 2012.

18       54.    On or about November 3, 2011, Ross publicly announced that its October 2011 overall

19  sales grew by approximately 10% as compared to the same period in the prior year.  Ross also

20  announced that same store sales during the same period grew 5% over the prior year.  These results

21  were quite positive.  On or about November 3, 2011, Ross shares closed at $89.19, up 3% from its

22  prior day close of $86.63.

23       55.    Saleem Khan generated realized and unrealized profits of approximately $357,000

24  based on his illegal trades ahead of the Ross' November 3, 2011 announcement, and Akbari

25  generated realized and unrealized profits of $1,300 ahead of the same announcement.

26

27

28

**E. Saleem Khan Transfers Illegal Insider Trading Proceeds back to Chaganlal by Passing the Funds through Third Parties.**

56.     In or around February and March 2012 and then again in or around August 2012, Saleem Khan transferred approximately $130,000 from brokerage accounts he controlled to Chaganlal.  Saleem Khan and Chaganlal arranged to transfer these funds through third party intermediaries, including Akbari, in order to avoid detection.

57.     In the first set of transfers, Saleem Khan sent approximately $55,000 from his brokerage account to his personal bank account on or around February 28, 2012.  On or around that same day, Saleem Khan gave Akbari a check for approximately $35,000, and Akbari gave Chaganlal's wife two checks also totaling approximately $35,000.  About three weeks later, on or about March 22, 2012, Saleem Khan gave Akbari another check, this time for approximately $20,000, and Akbari gave Chaganlal's wife a check made out for approximately the same amount.

58.     In or around August 2012, Saleem Khan transferred another approximately $75,000 from his brokerage account to Chaganlal.  In particular, between on or around August 10, 2012 through August 22, 2012, Saleem Khan: caused a transfer of approximately $150,000 from Shahid Khan's brokerage account (which Saleem Khan controlled) to Shahid Khan's bank account; a transfer of approximately $150,000 from Shahid Khan's bank account to a real estate firm owned by Saleem Khan; a transfer of approximately $75,000 from the real estate firm to a business associate of Saleem Khan; a transfer of approximately $75,000 from this business associate to a title company that was handling the closing on Chaganlal's purchase of a newly constructed home in Dublin, California. The title company credited the approximately $75,000 toward Chaganlal's payment obligation.

59.     The payments alleged above represented compensation from Saleem Khan to Chaganlal for the material nonpublic information that Chaganlal provided about Ross Stores' sales figures and financial results.

**F. Michael Koza Holds the Proceeds of Certain Fraudulent Trades by Saleem Khan in Ross Securities.**

60.     In late 2011, Saleem Khan began making illegal insider trades in a brokerage account owned by Michael Koza, a business associate of one of Saleem Khan's real estate contacts.  In or around August and September 2011, Saleem Khan funded a brokerage account that had been opened

1   in Koza's name by routing approximately $20,000 in cash and cashier's checks through Koza's

2   business associate, which Koza ultimately deposited in Koza's brokerage account. Saleem Khan then

3   traded Ross and Taleo options in Koza's account (as alleged in detail below).

4           61.    In or around November and December 2011, Chaganlal communicated regularly with

5   Saleem Khan, providing him with the material nonpublic information he possessed regarding Ross'

6   impending sales announcement.

7           62.    On or about November 16 and 17, 2011, Ross' flash reports showed that its month-to-

8   date same store sales were up nearly 6%. Chaganlal passed this information to Saleem Khan, who

9   used the information to trade in Koza's account. On or about November 17 and 18, 2011 (following

10  calls between Chaganlal and Saleem Khan on or about November 16 and 17), Saleem Khan bought,

11  in Koza's account, approximately 80 Ross call options ahead of Ross' December 1, 2011

12  announcement that its November sales had increased 10% as compared to November 2010. On or

13  about December 1, 2011, Saleem Khan sold these calls for a realized profit of approximately $7,000.

14          63.    On or about December 27, 2011, Ross' daily flash sales showed same store sales were

15  up 8.3%. That morning, Chaganlal passed this information to Saleem Khan in a phone call that lasted

16  1½ minutes. Saleem Khan then used this information to trade in Koza's account -- on or about

17  January 4, 2012, Saleem Khan bought, in Koza's account, Ross call options, this time ahead of Ross'

18  January 5, 2012 announcement of December 2011 sales, producing realized and unrealized profits of

19  over $13,000.

20      **G. Saleem Khan Illegally Bought Taleo Securities ahead of Oracle's February 9, 2012**
            **Announcement of its Intention to Acquire Taleo.**
21

22          64.    In or around 2011, Saleem Khan became friends with a person who was employed by

23  Oracle from 2005 through August 2013 (the "Oracle Insider"). The Oracle Insider's areas of

24  responsibility included advising on the types of investments Oracle should make to build software

25  products for human resources and employment benefits. During late 2011 and early 2012, the Oracle

26  Insider was Oracle's point of contact with a competitor of Taleo.

27

28

65. On or about January 6, 2012, the Oracle Insider learned from one of his direct reports that Oracle was interested in acquiring a company in Taleo's business segment, and that the most likely acquisition target was Taleo.

66. After learning of Oracle's potential interest in such an acquisition, the Oracle Insider learned of additional material nonpublic information that tended to confirm that Oracle's target was Taleo, and not the company for which the Oracle Insider acted as Oracle's point of contact. Among other things, the Oracle Insider closely observed the activities of his supervisor, who had been confidentially assigned to work on Oracle's bid for Taleo.

67. On or about the morning of February 3, 2012, the Oracle Insider sent a text message to Saleem Khan asking Khan to call him and they spoke twice by phone. During these calls, the Oracle Insider passed information to Saleem Khan about Oracle's planned acquisition of Taleo. About six minutes after their second conversation, Saleem Khan began buying large numbers of Taleo call options, spending a total of approximately $80,000.

68. On or about February 6, 7 and 8, 2012, Saleem Khan purchased additional Taleo call options in his own account. From about February 3, 2012 through February 8, 2012, Saleem Khan's options trading at times exceeded 90% of the daily volume for the option series in which he traded.

69. On or about February 8, 2012, Saleem Khan purchased additional Taleo call options in Koza's brokerage account.

70. On or about the morning of February 9, 2012, before the market opened, Oracle publicly announced its offer to acquire Taleo for $1.9 billion, or $46 per share. That day, as a result of the acquisition announcement, the price of Taleo shares increased by approximately 17%.

71. As a result of his trading, Saleem Khan generated realized and unrealized profits of approximately $450,000.

**H. Corporate Confidentiality Policies Protected the Relevant Inside Information.**

72. Saleem Khan, Chaganlal, Mendonsa and Akbari were each aware of important legal prohibitions against "insider trading," that is, trading a company's securities on the basis of material nonpublic company information.

73.     For instance, when Saleem Khan became a broker in the securities industry during the 1990s, he took and passed a regulatory exam that tested his knowledge of insider trading prohibitions.

74.     Furthermore, from in or around the mid-2000's, Saleem Khan, Chaganlal, Mendonsa, and Akbari worked at the corporate offices of a large, publicly-traded San Francisco Bay Area grocery chain, where they were each provided with, and acknowledged their understanding of, the company's Code of Business.  This Code of Business prohibited the disclosure of inside information except as authorized by law and stated, among other things, that federal and state laws and regulations prohibit the use of "inside information" when buying or selling company securities, or recommending such actions to others.

75.     Similarly, Ross maintained a policy against insider trading at all times during Chaganlal's employment.  Thus, beginning in or around February 2007, when Chaganlal joined Ross' finance department, Chaganlal received Ross' policies against insider trading and disclosure of confidential information, including the company's financial information.  Similarly, Ross' "Corporate Office Associate Handbook" and its policy on confidential information and avoiding conflicts of interest ("Ross Confidential Information Policy") required its employees to keep the company's information confidential and prohibited employees from disclosing, releasing or selling the company's information without authorization.  The Ross Handbook and Ross Confidential Information Policy also prohibited employees from trading on "inside information."

76.     Throughout his employment at Oracle, the Oracle Insider was subject to the terms of his company's policy against insider trading.  Oracle's insider trading policy explained that inside information is material information that is not available to the general public, including information concerning Oracle as well as other companies, information regarding discussions or negotiations between Oracle and other companies, and information about potential or ongoing mergers or acquisitions.  The policy required its employees to keep inside information confidential at all times, to refrain from tipping inside information to anyone, and to refrain from trading in the securities of Oracle or any other company while possessing inside information obtained through their work at Oracle.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Defendants Saleem Khan, Akbari, Chaganlal, and Mendonsa)**

77.     The Commission realleges and incorporates by reference paragraphs 1 through 76, as though fully set forth herein.

78.     The information concerning Ross's sales and financial results that Chaganlal provided to Saleem Khan and that Saleem Khan passed to Mendonsa and Akbari was, in each case, material and nonpublic.  In addition, the information was, in each case, considered confidential by Ross, the company that was the source of the information, and Ross had policies protecting confidential information.

79.     Chaganlal provided material nonpublic information to Saleem Khan in breach of the fiduciary duty that Chaganlal, an employee of Ross, owed to Ross, and did so with the expectation of receiving a benefit and/or to confer a financial benefit on Saleem Khan.

80.     Saleem Khan knew, recklessly disregarded, or should have known, that Chaganlal owed a fiduciary duty, or obligation arising out of a similar relationship of trust and confidence, to keep the Ross information confidential.

81.     The information that the Oracle Insider provided to Saleem Khan regarding Oracle and Taleo was material and nonpublic.  In addition, the information was considered confidential by Oracle, the company that was the source of the information and which had policies protecting confidential information.

82.     The Oracle Insider provided material nonpublic information to Saleem Khan in breach of the fiduciary duty that the Oracle Insider owed to Oracle, and did so with the expectation of receiving a benefit and/or to confer a financial benefit on Saleem Khan.

83.     Saleem Khan knew, recklessly disregarded, or should have known, that the Oracle Insider owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the Oracle information concerning Taleo confidential.

84.     Defendants Akbari and Mendonsa knew, recklessly disregarded, or should have known, that the material nonpublic information concerning Ross that they received from Saleem

1   Khan was disclosed and/or misappropriated in breach of a fiduciary duty, or similar relationship of

2   trust and confidence.

3       85.     By virtue of the foregoing, Defendants, in connection with the purchase or sale of

4   securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a

5   facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or

6   artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts

7   necessary in order to make the statements made, in light of the circumstances under which they were

8   made, not misleading; or (c) engaged in acts, practices or courses of business which operated or

9   would have operated as a fraud or deceit upon persons.

10      86.     By virtue of the foregoing, Defendants directly or indirectly violated, and unless

11  enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

12  thereunder [15 U.S.C. § 240.10b-5].

13
14
### SECOND CLAIM FOR RELIEF
### Equitable Claim Against Relief Defendant Shahid Khan

15      87.     The Commission incorporates by reference the allegations in paragraphs 1 through 86

16  as though fully set forth herein.

17      88.     Relief Defendant Shahid Khan, directly or indirectly, received or possesses funds, or

18  benefited from the use of such funds, which are the proceeds of the unlawful activity by Saleem Khan

19  alleged above.

20      89.     Relief Defendant Shahid Khan has no legitimate claim to such funds, directly or

21  indirectly.

22      90.     The Commission is entitled to an order, pursuant to common law equitable principles

23  and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], requiring Shahid Khan

24  to disgorge the proceeds of the illegal activities alleged herein that he has received or possesses or

25  from which he has benefited, either directly or indirectly.

26
27
28

**THIRD CLAIM FOR RELIEF**
**Equitable Claim Against Relief Defendant Michael Koza**

91. The Commission incorporates by reference the allegations in paragraphs 1 through 86 as though fully set forth herein.

92. Relief Defendant Koza, directly or indirectly, received or possesses funds, or benefited from the use of such funds, which are the proceeds of the unlawful activity by Saleem Khan alleged above.

93. Relief Defendant Koza has no legitimate claim to such funds, directly or indirectly.

94. The Commission is entitled to an order, pursuant to common law equitable principles and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], requiring Koza to disgorge the proceeds of the illegal activities alleged herein that he has received or possesses or from which he has benefited, either directly or indirectly.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

**I.**

Finding that the Defendants committed the violations alleged herein;

**II.**

Permanently enjoining each of the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5];

**III.**

Ordering each of the Defendants to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the conduct alleged in the Complaint, including, as to each of the Defendants, their own illicit trading profits, other ill-gotten gains, and/or losses avoided, and the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees;

**IV.**

Ordering each of the Relief Defendants to disgorge all illicit trading profits in their possession, custody or control and other ill-gotten gains received and/or losses avoided as a result of the conduct alleged in the Complaint;

**V.**

Barring Defendant Chaganlal pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

**VI.**

Ordering Defendants each to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

**VII.**

Granting such other relief as this Court may deem just and appropriate.

Date:  June 13, 2014

                                  _____/s/ Victor Hong_____
                                  VICTOR HONG
                                  Attorney for Plaintiff
                                  SECURITIES AND EXCHANGE
                                  COMMISSION

APPENDIX

(PAGE 1)

| Announcement Date | Public Statement by Ross | Did Defendant Trade in Ross Securities Ahead of Ross Announcement? | | |
|---|---|---|---|---|
| | | Saleem Khan | Ranjan Mendonsa | Ammar Akbari |
| 8/6/09 | Ross Announces July Sales | Y | Y | N |
| 8/20/09 | Ross Announces Q2 2009 Results | Y | Y | N |
| 9/3/09 | Ross Announces Aug Sales | Y | N | N |
| 10/8/09 | Ross Announces Sept Sales | Y | Y | N |
| 11/5/09 | Ross Announces Oct Sales | Y | Y | N |
| 11/19/09 | Ross Announces Q3 2009 Results | Y | Y | N |
| 12/3/09 | Ross Announces Nov Sales | Y | Y | N |
| 1/7/10 | Ross Announces Dec Sales | Y | N | N |
| 2/4/10 | Ross Announces Jan Sales | Y | Y | N |
| 3/4/10 | Ross Announces Feb Sales | Y | N | N |
| 3/28/10 | Ross Announces Q4 and FY 2009 Results | Y | Y | N |
| 4/8/10 | Ross Announces March Sales | Y | Y | N |
| 5/6/10 | Ross Announces Apr Sales | Y | Y | N |
| 6/3/10 | Ross Announces May Sales | Y | Y | N |
| 7/8/10 | Ross Announces June Sales | Y | N | N |
| 8/5/10 | Ross Announces July Sales | Y | Y | N |
| 8/19/10 | Ross Announces Q2 2010 Results | Y | N | N |
| 9/2/10 | Ross Announces Aug Sales | Y | Y | N |
| 10/7/2010 | Ross Announces Sept Sales | Y | N | N |
| 11/4/2010 | Ross Announces Oct Sales | Y | N | N |
| 11/18/2010 | Ross Announces Q3 2010 Results | Y | N | N |
| 12/2/2010 | Ross Announces Nov Sales | Y | Y | N |
| 1/6/2011 | Ross Announces Dec Sales | Y | Y | N |
| 2/3/2011 | Ross Announces Jan Sales | Y | Y | N |
| 3/10/2011 | Ross Announces Q4 and FY 2010 Results | Y | Y | N |
| 5/5/2011 | Ross Announces Apr Sales | Y | Y | N |
| 5/19/2011 | Ross Announces Q1 Results | Y | N | Y |
| 6/2/2011 | Ross Announces May Sales | Y | N | N |
| 7/7/2011 | Ross Announces June Sales | Y | Y | N |
| 8/4/2011 | Ross Announces July Sales | Y | Y | N |
| 8/18/2011 | Ross Announces Q2 2011 Results | Y | Y | N |
| 10/6/2011 | Ross Announces Sept Sales | Y | Y | N |
| 11/3/2011 | Ross Announces Oct Sales | Y | Y | Y |
| 11/17/2011 | Ross Announces Q3 2011 Results | Y | N | N |
| 12/1/2011 | Ross Announces Nov Sales | Y | Y | N |
| 1/5/2012 | Ross Announces Dec Sales | Y | Y | N |
| 2/2/2012 | Ross Announces Jan Sales | Y | Y | N |
| 3/1/2012 | Ross Announces Feb Sales | Y | Y | N |
| 3/15/2012 | Ross Announces Q4 and FY 2011 Results | Y | N | N |
| 4/5/2012 | Ross Announces March Sales | Y | N | N |
| 5/3/2012 | Ross Announces Apr Sales | Y | Y | N |
| 5/17/2012 | Ross Announces Q1 2012 Results | Y | N | N |
| 5/31/2012 | Ross Announces May Sales | Y | N | N |

APPENDIX

(PAGE 2)

| Announcement Date | Public Statement by Ross | Did Defendant Trade in Ross Securities Ahead of Ross Announcement? | | |
|---|---|---|---|---|
| | | Saleem Khan | Ranjan Mendonsa | Ammar Akbari |
| 8/2/2012 | Ross Announces July Sales | Y | N | N |
| 8/30/2012 | Ross Announces Aug Sales | Y | N | N |
| 10/4/2012 | Ross Announces Sept Sales | Y | N | N |
| 11/1/2012 | Ross Announces Oct Sales | Y | N | N |
| 11/15/2012 | Ross Announces Q3 2012 Results | Y | N | N |